**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| ANGELO MARTINELLI<br><br>Plaintiff,<br><br>vs.<br><br>DEPUY ORTHOPAEDICS INC. an Indiana Corporation; DEPUY INC. an Indiana Corporation JOHNSON & JOHNSON, a New Jersey Corporation; and JOHNSON & JOHNSON SERVICES Inc., a New Jersey Corporation, JOHNSON & JOHNSON INTERNATIONAL, a New Jersey Corporation, and John Does 1 through 100.<br><br>Defendants. | ) | Case No.: |

COMPLAINT AND JURY DEMAND

## PARTIES

1. Plaintiff Angelo Martinelli is a citizen and resident of the City and County of Denver, Colorado.

2. Defendant DePuy Orthopaedics, Inc., et al. ("DePuy") is, and at all times relevant to this complaint was, an Indiana Corporation duly organized and existing by law, in good standing, with its principal place of business at 700 Orthopaedic Drive, Warsaw, Indiana 46581. DePuy is and was at all times relevant herein doing business in and/or having directed its activities at the State of Colorado, and regularly conducted business in the State of Colorado and throughout the United States. DePuy designed, manufactured, and sold the AML Total Hip System that is subject of this lawsuit.

3. Defendant Johnson & Johnson, et al.("J&J") is, and at all times relevant to this complaint was, a New Jersey Corporation duly organized and existing by law, in good standing, with its

principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J is and was at all times relevant herein doing business in and/or having directed its activities at the State of Colorado and regularly conducted business in the State of Colorado and throughout the United States. As DePuy's parent company, J&J was involved in the design, manufacture, and sale of the AML Total Hip System that is subject to this lawsuit.

4. At all times relevant herein, Defendants transacted, solicited, and conducted business in the State of Colorado and in this case sold the subject devise to Plaintiff to be implanted in the Plaintiff at OrthoColorado Hospital, Lakewood, Colorado. Defendants derived substantial revenue from such business.

5. At all times relevant herein, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, advertising, promoting, marketing, distributing, labeling, and/or selling the subject product.

6. At all times relevant herein, Defendants expected or should have expected that their acts would have consequences within the United States, and in the State of Colorado in particular.

7. At all times relevant herein, Defendants were acting by and through their agents, servants and employees whom were all acting within the course and scope of their employment.

8. At all times relevant herein, each Defendant was the representative, agent, employee or alter ego of the other defendant and in doing the things alleged herein was acting within the scope of its authority. DePuy and J&J are collectively referred to herein as "Defendants."

9. At this time, Plaintiff is unaware of the true names and capacities of defendants DOES 1 through 100, and therefore sues these defendants by such fictitious names. Plaintiff will amend his complaint to allege the true names and capacities of defendants DOES 1 through 100 when they have been ascertained.

10. Defendants DOES 1 through 100 are responsible in some manner for Plaintiff's damages, as described in this complaint. Any reference in this complaint to "Defendant/s" also refers to defendants DOES 1 through 100.

**JURISDICTION AND VENUE**

11. Complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and therefore subject matter jurisdiction in this Court is proper under 28 U.S.C. §1332.

12. This Court has personal jurisdiction over the Defendants pursuant to the Colorado long arm statute, §13-1-124, C.R.S., in that Defendants transacted business in the State of Colorado, made a contact within the State of Colorado and/or committed a tortious act in this State.

13. The Defendants, and each of them, have sufficient minimum contacts with the State of Colorado to justify the exercise of personal jurisdiction over it by the Court. Specifically, Defendants conduct substantial business in the state of Colorado, market and sell their products in the State of Colorado, and direct their business toward the residents of the State of Colorado.

14. Venue is proper pursuant to 28 U.S.C. §1391(a)(2) as Plaintiff's claims and causes of action arise out of events and omissions that substantially occurred within the judicial district for the District of Colorado, 10th Circuit.

**STATEMENT OF FACTS**

15. The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

16. A medical device on the market prior to the effective date of the MDA, a so-called "grandfathered device," was not required to undergo premarket approval.

17. A medical device marketed *after* the MDA's effective date may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a "grandfathered" pre-MDA device (i.e. a device approved prior to May 28, 1976). This exception to premarket approval is known as the "501(k)" process and simply requires the manufacturer to notify the FDA under section 210(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and explain the device's substantial equivalence to a pre-MDA predictive device. The FDA may then clear the new device for sale in the United States.

18. The MDA does not require an FDA determination that the device is in fact, substantially equivalent to a grandfathered device.

19. Instead of assuring the safety of the AML Total Hip System through clinical trials, DePuy sought to market its Pinnacle Hip without conducting any clinical trials by obtaining FDA approval under section 510(k). To that end, Defendants submitted a section 510(k) premarket notification of intent to market the AML Total Hip System.

20. By telling the FDA that the AML Total Hip System design was "substantially equivalent" to other hip products on the market, DePuy was able to avoid the safety review required for premarket approval under FDA regulations including clinical trials.

21. The FDA cleared the Pinnacle Hip for sale by means of the abbreviated 510(k) process and consequently, the FDA did not require the Pinnacle Hip to undergo clinical trials.

22. The 510(k) notification for the Pinnacle Hip includes only Defendant DePuy's assertion that it believes the Pinnacle Hip to be substantially equivalent to devices that themselves had never been reviewed for safety and effectiveness.

23. Significantly, unlike the premarket approval process, the 510(k) notification process does not call for scrutiny or even clinical testing of a device's safety and effectiveness.

24. A finding of substantial equivalence is not equivalent to a finding of devices' safety and effectiveness. This point is forcefully underscored by the FDA's 510(k) approval letter to DePuy, which says nothing about the safety and effectiveness of the Pinnacle Hip; finds only that the device was "substantially" equivalent to devices introduced into interstate commerce prior to May 28, 1976; and concludes by stressing that the agency's determination of substantial equivalence "does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies."

25. Thus, the FDA's finding of "substantial equivalence" had nothing to do with reviewing the Pinnacle Hip's safety and effectiveness, but rather was only a determination of its equivalence to devices that themselves underwent no safety and effectiveness review.

26. The most common defect with the Pinnacle Hip is that the Pinnacle Hip suffers from a design or manufacturing defect that forced DePuy to recall in August of 2010 over 93,000 similar metal-on-metal ASR and ASR XL hip implants.

27. After DePuy launched the Pinnacle Hip, failure reports began flooding into DePuy. Upon information and belief, Plaintiff alleges that the FDA has received more than 1,300 adverse reports regarding problems associated with or attributed to Pinnacle Devices. It is believed that the vast majority of these reports are related to the metal on metal defect casting off chromium and cobalt fragments. It is unknown at this time how many stem failures there have been with the titanium femoral stem component.

## PLAINTIFF ANGELO MARTINELLI

28. Plaintiff Angelo Martinelli is a 53-year-old police lieutenant who necessitated a hip replacement surgery on November 30, 2005. The AML Total Hip System implanted into Plaintiff's left hip was the component system identified in paragraph 19 above.

29. As a result of the defective design, manufacture, and composition of the device, and its inadequate accompanying warnings and instructions, the femoral stem fractured mid shaft causing constant and severe pain and the inability to walk necessitating emergency surgery.

30. On or around November 6, 2017, in Lakewood, Colorado, Dr. Ronald Hugate, Jr. diagnosed Plaintiff with fracture and failure of the femoral prosthetic shaft. Plaintiff's orthopedic surgeon, Dr. Hugate performed the dangerous and complicated explant surgery and implanted a new device on November 7, 2017 at OrthoColorado Hospital, Lakewood, Colorado.

31. Plaintiff underwent several months of therapy and medical treatment. Plaintiff was not cleared to return to work until December 9, 2017, and was required to work "light duty" until February 17, 2018.

32. Plaintiff has suffered diminished strength in his hip and has difficulty standing for long periods, walking long distances, walking down stairs, and driving for extended periods of time. He cannot cross his legs, break a 45 degree plane, or sleep well. He must refrain from racquetball, hiking, tennis, water skiing, snow skiing, elk hunting and other physical activities he used to enjoy. He cannot play sports with his children or grandchildren. As a police lieutenant, he is often required to work in full uniform including a gun belt, the weight of which now creates a limp in his gait due to his injuries. He has had pain and suffering and permanent physical impairment.

33. As a result of these injuries, Plaintiff lost income and benefits from work. As a direct result of the fractured femoral stem, Plaintiff underwent a painful and debilitating hip revision surgery and implantation of a new devise. Because the shaft broke inside the femoral bone, Plaintiff's femur had to be broken in half to remove the failed devise. Plaintiff's revision surgery lasted 4 ½ hours and necessitated cutting through muscle, requiring a much longer and more painful recovery. To date, Plaintiff still experiences pain at the surgical site and has continued anxiety about whether he will experience another break. Plaintiff has become physically impaired as a result of the failed devise and will not have a normal work-life expectancy.

34. Plaintiff has incurred medical expenses in connection with surgeries, rehabilitation, and continued treatment. As a result of the failure of the devise and subsequent surgery, Plaintiff expects to incur future medical expenses.

35. Plaintiff now faces greater risk of future complications, including but not limited to hip dislocations, because he was required to undergo a hip revision surgery.

36. Plaintiff's special damages and general damages are a presently unascertained sum as said losses are not yet finally determined. Plaintiff prays leave to amend this complaint when these elements of damage are finally determined.

## FIRST CAUSE OF ACTION

### (Strict Liability-Manufacturing Defect)

37. For a First Cause of Action plaintiff Angelo Martinelli complains of Defendants and DOES 11 through 20 alleges as follows:

38. Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

39. Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the AML Total Hip System for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States and the State of Colorado.

40. At all times herein mentioned, the Defendants designed, distributed, manufactured, and marketed medical devices for commercial distribution, to be sold to medical patients as implantable total hip prosthesis, specifically the AML Total Hip System that includes the AML Large Stature femoral stem component. Defendants sold the above-described Pinnacle Hip, which was implanted in Plaintiff. When sold, it was dangerous, unsafe, and defective in design and manufacture.

41. At the time of the sale, the system, and in particular the femoral stem component, was then in a defective condition and was unreasonably dangerous when put to a reasonably anticipated use, even if properly installed, in that Defendants' product was subject to premature and sudden fatigue fracture due to:

a. the inadequately low fatigue strength and inadequately limited ductility of the alloy used for the product;

b. an inadequate annealing process carried out in the manufacturing of the product and/or the product's material;

c. subsurface voids or inclusions consistent with thermal changes to the microstructure of the alloy that caused a focal reduction in the material strength; and

d. other yet unknown design or manufacturing defects.

42. The aforementioned defects created an unreasonably dangerous risk of stem fracture when using Defendants' product.

43. At all relevant time, Defendants' AML Pinnacle Total Hip System's femoral stem product was used in a manner reasonably anticipated.

44. As a direct and proximate result of the defective condition of the Pinnacle Hip System's femoral stem component as existed when the component was sold, Plaintiff was injured and damaged as set out with more particularity in paragraphs 28 through 36 of this Complaint.

45. WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

**SECOND CAUSE OF ACTION**

**(Strict Liability-Failure to Warn)**

46. For a Second Cause of Action plaintiff Angelo Martinelli complains of Defendants and DOES 21 through 30 alleges as follows:

47. Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

48. Prior to, on, and after the date of Plaintiff's initial hip surgery, and al all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the AML Total Hip System for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States and the State of Colorado.

49. The AML Total Hip System posed increased risks of harm and side effects that were known or knowable to Defendants by the use of scientific knowledge available before, at and after the time of manufacture, distribution, and sale of the Pinnacle Hip. Defendants knew or should have known of the defective condition characteristics and risks associated with said risks as previously set forth herein. Defendants consciously disregarded this increase risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with

implantation of the Pinnacle Hip; and continuing to market, promote, sell and defend the Pinnacle Hip.

50. The AML Total Hip System that was manufactured, distributed, and sold by the Defendants to Plaintiff was in a defective condition that was unreasonably and substantially dangerous to any users or ordinary consumers of the device, such as Plaintiff. Such ordinary consumers, including Plaintiff, would not and could not have recognized or discovered the potential risks and side effects of the Pinnacle Hip as alleged herein.

51. The warnings and directions provided with the Pinnacle Hip by Defendants failed to adequately warn of the potential risks and side effects of the Pinnacle Hip and the dangerous propensities of said medical device, which risks were known or were reasonably scientifically knowable to Defendants.

52. Defendants' Pinnacle Hip components were expected to and did reach Plaintiff and his physicians without substantial change in their condition as manufactured, distributed and sold by Defendants. Additionally, Plaintiff's physicians used the Pinnacle Hip in the manner in which the Pinnacle Hip was intended to be used, making such use reasonably foreseeable to Defendants.

53. As a direct and proximate result of Defendants' manufacture, distribution, and sale of the Pinnacle Hip, Plaintiff suffered the injuries, losses and damages herein described.

54. Defendants' lack of sufficient instructions or warnings prior to, on, and after the date of Plaintiff's initial hip surgery was a substantial factor in causing Plaintiff's injuries and damages, as described here.

55. WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

**THIRD CAUSE OF ACTION**

**(Negligence-Design, Manufacture and Sale)**

56. For a Third Cause of Action plaintiff Angelo Martinelli complains of Defendants and DOES 31 through 40 and alleges as follows:

57. Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

58. Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant times, Defendants designed, distributed, manufactured, sold, and marketed the AML Total Hip System for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States and the State of Colorado.

59. Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants were negligent and careless in and about their design, testing, distribution, manufacture, advertising, sale and marketing of the above-described Pinnacle Hip.

60. Prior to, on, and after the date of Plaintiff's initial hip surgery; Defendants failed to perform adequate evaluation and testing of the Pinnacle Hip, where such adequate evaluation and testing would have revealed the propensity of the Pinnacle Hip's stem to fracture.

61. Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants had received complaints from healthcare providers that the Pinnacle Hip caused serious complications, including detachment, disconnection, creation of metallic debris and/or loosening of the acetabular cup from the acetabulum, and failure and fracture of the stem, but Defendants nonetheless consciously decided not to perform any further testing on the Pinnacle Hip; investigate the root cause of these complications; suspend sales and distribution; or warn physicians and patients of the propensity of the device's stem to fracture.

62. As a direct and proximate result of the above-described negligence in design, testing, distribution, manufacture, advertising, sales and marketing, Plaintiff suffered the injuries losses and damages herein described.

63. Defendants' negligence in design, testing, distribution, manufacture, advertising, sales and marketing prior to, on, and after the date of Plaintiff's initial hip surgery was a substantial factor in causing Plaintiff's injuries, losses, and damages, as described herein.

64. As alleged above, Defendants knew and had reason to know that the Pinnacle Hip caused increased risk of harm to the Plaintiff and other consumers like him. Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the AML Total Hip System; and continuing to market, promote, sell and defend the Pinnacle Hip.

65. WHEREFORE, Plaintiff demands judgment against Defendants as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### (Negligence-Failure to Warn)

66. For a Fourth Cause of Action plaintiff Angelo Martinelli complains of Defendants and DOES 41-50 and alleges as follows:

67. Plaintiff hereby incorporates by reference all previous paragraphs, as though alleged fully in this Cause of Action.

68. Prior to, on, and after the date of Plaintiff's initial hip surgery, and at all relevant times, Defendants designed, distributed manufactured, sold, and marketed the AML Total Hip System for implantation into consumers, such as Plaintiff, by physicians and surgeons in the United States and the State of Colorado.

69. Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants knew or should have known that Pinnacle Hip was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner. Such danger included the propensity of the device's stem to loosen and fracture requiring revision surgery.

74. Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendant knew or reasonably should have known that the users of the device, including Plaintiff would not realize the dangers presented by the device.

75. Prior to, on, and after the date of Plaintiff's initial hip surgery, Defendants failed to adequately warn of the dangers presented by the device and failed to instruct on the safe use of the device. Such failures to warn and/or instruct included, but were not limited to: failing to advise of the known or knowable risks, dangers, and side effects associated with the use of the Pinnacle Hip; and failing to properly advise of the means and methods available for the elimination of the risks, dangers, and side effects associated with the Pinnacle Hip, including detachment, disconnection, loosing and/or stem fracture.

76. Defendants failed to warn physicians about the risks, dangers, and side effects associated with the Pinnacle Hip, including the risks of loosening and stem fracture as well as associated complications; and failing to notify consumers about the risks, dangers, and side effects associated with the Pinnacle Hip.

77. Reasonable manufacturers and reasonable distributors, under the same or similar circumstances as those of Defendants prior to, on, and after the date of Plaintiff's initial surgery, would have warned of the dangers presented by the Pinnacle Hip, or instructed on the safe use of the Pinnacle Hip.

78. Prior to the date of Plaintiff's initial hip surgery; the Pinnacle Hip had already caused numerous instances of loosening and stem fracture.

79. Defendants consciously decided not to warn physicians or patients of the Pinnacle Hip's increased propensity to cause these serious complications or of the signs and symptoms of these complications.

80. Defendants' negligent failure to warn Plaintiff or Plaintiff's medical care providers prior to, on, and after the date of Plaintiff's initial hip surgery was a substantial factor in causing Plaintiff's injuries, losses and damages as described herein.

81. As alleged above, Defendants knew and had reason to know that the Pinnacle Hip caused increased risk of harm to the Plaintiff and other consumers like him. Defendants consciously disregarded this increased risk of harm by failing to warn of such risks; unlawfully concealing the dangerous problems associated with implantation of the Pinnacle Hip; and continuing to market promote, sell and defend the Pinnacle Hip.

Plaintiff demands a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a. For general (non-economic) damages according to proof at the time or trial;

b. For special (economic) damages according to proof at the time of trial;

c. For prejudgment interest as permitted by law;

d. For costs of suit incurred herein as permitted by law, and

e. For such other and further relief as this Court may deem proper.

Dated: 12/6/18

Karla Carrigan
David L. Worstell
Karla H. Carrigan
Worstell & Associates
Attorneys for Plaintiff